Honorable James O. GERST, Savings and
Loan Commissioner of Texas
et al., Appellants,

v.

GUARDIAN SAVINGS AND LOAN
ASSOCIATION, Appellee.

No. 11574.

Court of Civil Appeals of Texas.

Austin.

Feb. 28, 1968.

Rehearing Denied March 20, 1968.

Crawford C. Martin, Atty. Gen., George Cowden, 1st Asst. Atty. Gen., A. J. Carubbi, Jr., Staff Legal Asst. Atty. Gen., Sam Kelley and T. Ray McGregor, Asst. Attys. Gen., Austin, for Sav. & Loan Comm.

Jacobsen & Long, Joe R. Long, Austin, for Richardson Savings & Loan Ass'n.

Heath, Davis & McCalla, Dudley D. McCalla, Austin, for appellees.

O'QUINN, Justice.

Two savings and loan associations, both domiciled in Dallas County, filed applications with the Savings and Loan Commissioner of Texas on April 10, 1966, seeking authority to locate branch offices on opposite corners of Belt Line Road and Coit Road.

Guardian Savings and Loan Association filed its application first, requesting

approval of a branch to be located immediately north of Belt Line Road, and west of Coit Road, in the city of Dallas. About an hour later Richardson Savings and Loan Association filed to locate a branch immediately south of Belt Line Road and east of Coit Road in the city of Richardson. In this area Coit Road, running north and south, marks the common corporate limits of Dallas and Richardson.

The Commissioner heard both applications at a proceeding held September 27, 1966. In separate orders entered October 27, 1966, the Commissioner denied the application of Guardian Savings and approved the application of Richardson Savings.

Guardian Savings filed suit in district court seeking to have set aside the Commissioner's order refusing its application and also to set aside the order granting the application of Richardson Savings.

The trial court entered judgment July 14, 1967, setting aside the order denying the application of Guardian Savings as void and not supported by substantial evidence and remanding the proceeding to the Commissioner with instructions to approve the application. The trial court in the same judgment held the order granting the application of Richardson Savings in all things valid and reasonably supported by substantial evidence.

Richardson Savings and Loan intervened in district court. In this appeal Richardson Savings has aligned itself with the Commissioner. This is an appeal from the judgment of the trial court only in so far as that court set aside and held for naught the order of the Commissioner denying Guardian Savings its branch office.

Appellants present one point of error. This point is the error of the trial court in holding that the Commissioner's order denying a branch office to Guardian Savings was not reasonably supported by substantial evidence.

At the hearing in September, 1966, the Commissioner on his own motion entered an exhibit (Resolution of the Federal Home Loan Bank Board, dated March 24, 1966) reading in part as follows:

"The application of the Dallas Federal Savings and Loan Association, Dallas, Texas, for permission to *move its branch office* from 52 Richardson Heights, Richardson, Texas, to a location at, or in the immediate vicinity of, the intersection of Cottonwood Street and Beltline Road, Richardson, Texas, is hereby approved; provided that such move is effected not later than twelve months from the date of this approval." (Emphasis added.)

Appellants apparently regard this authority "to move its branch office" as tantamount to a creation of a new facility to be operated by Dallas Federal Savings. "At the hearing the Commissioner, on his own motion," appellants state, "entered an exhibit showing that a Federally chartered association had recently received permission *to establish* a branch office in a location which would conveniently serve the public living and working in the same geographical area which would be served by either of the proposed branch offices, the applications for both of which were then pending before him." (Emphasis added.)

Continuing, appellants contend that, "In view of the *recently approved* Federal branch office, the Commissioner was faced with the choice of whether he would approve no *additional new* offices to serve this suburban area, one *additional new* office or *two additional new* offices. * * * The *establishment of the two new offices* by the authorities obviously adequately serves the public in the area. Guardian must show that the Commissioner acted unreasonably under the evidence in refusing a *third office*." (Emphasis added.)

We do not agree that the choices of the Commissioner were precisely as stated by appellants. The record is clear that the

authority granted Dallas Federal Savings was to move an existing branch office from downtown Richardson to a location near the western limits of Richardson, a distance of about two miles. At the time of the hearing there was no evidence that Dallas Federal Savings would or would not avail itself of the authority granted to move its branch office within the twelve months allowed for the move.

Both Guardian Savings and Richardson Savings defined approximately the same primary market area proposed to be served. This area may be generally described as bound on the east by Central Expressway, which traverses the city of Richardson in a northeasterly direction from the north Dallas city limits, and bound on the west by North Dallas Tollway, with Johnson Freeway as its south limits and the county line defining the north boundary. The proposed branch office locations at Belt Line and Coit Roads would be near the center of the area and about two miles from each of the four boundary lines indicated.

Within the primary market area, at its extreme eastern limits, there were located at the time of the hearing three savings and loan facilities. Richardson Savings had its main office on Central Expressway in downtown Richardson, and Dallas Federal Savings and Oak Cliff Savings maintained branch offices in downtown Richardson at Central Expressway and Belt Line Road. All three of these offices were shown to be about two miles east of the sites proposed by Guardian Savings and Richardson Savings for branch offices.

Confronting the Commissioner was determination of the question whether the primary market area was such as to justify one or two additional branch offices, assuming Dallas Federal Savings did or did not move its branch office out of downtown Richardson to the same vicinity proposed by Guardian Savings and Richardson Savings for branch offices.

We think it appropriate at this juncture to dispose of the contention of Guardian Savings that, having filed first, this applicant was entitled to first consideration. While the Commissioner permitted Guardian Savings to be heard first at the proceedings, the Commissioner clearly decided first that the application of Richardson Savings should be granted. The Commissioner then ruled that Guardian Savings should be denied a branch office, and gave as his reason in effect the fact that he had already approved the Richardson Savings application. As already indicated, the two applications were filed the same day, but that of Guardian Savings preceded the filing of Richardson Savings by about one hour.

■ We overrule this contention. We are bound by two earlier decisions of this Court in which it was held that priority of filing applications may not be made the controlling factor in a final administrative decision, even though the applications are equally meritorious. State Banking Board of Texas v. McCulloch, 316 S.W.2d 259 (Tex.Civ.App., Austin, writ ref., n. r. e.); Farb v. State Banking Board of Texas, 343 S.W.2d 508 (Tex.Civ.App., Austin, n. r. e.). In each of these cases there was persuasive dissent on this point supported by substantial authority. If presented under the facts of this case as one of first impression, the point might be decided with a different result. But the Supreme Court denied application for writ of error (no reversible error) in each of the earlier cases, and the law is now settled.

It appears uncontradicted that the primary market area to be served by the branch offices proposed to be located at Belt Line and Coit Roads geographically would partially overlap the market already being served by the three facilities located in downtown Richardson. The proposed new locations would look for savings accounts, as well as loan business, largely to the area lying west, north and south of the intersection of Belt Line and Coit Roads. The overlap would be principally in that portion of Richardson lying between North Expressway on the east and Coit Road on

the west. This overlap was reduced about one-half by Guardian Savings in its application by placing the eastern boundary of its proposed market area along the northeast fork of White Rock Creek, which approximately bisects this area.

It was the testimony of Dr. Richard B. Johnson, who qualified as an expert, experienced in economic studies related to location of banks and savings and loan facilities, that for the want of "through routes" from the residential areas of Richardson northwest of Central Expressway to downtown Richardson, "the typical shopper traffic" from this area will "gravitate west" to the shopping facilities in the vicinity of Belt Line and Coit Roads. The residential area referred to by Dr. Johnson lies partially within the geographical overlap of the two primary markets.

If Dallas Federal Savings should move its branch office from downtown Richardson to a location near Belt Line and Coit Roads, it was Dr. Johnson's opinion the association "would carry with it * * * most of the accounts that already is tied to itself. It thus would lose relatively little and gain a better position * * *."

Dr. Johnson, testifying for Richardson Savings, stated that in his opinion "over a period of five to ten years, perhaps fifty percent of the accounts that Richardson Savings and Loan now has in [the area between Coit Road and Central Expressway] would gravitate to its office at Coit and Belt Line."

"During that time," Dr. Johnson testified, "if they follow policies that I think I shall suggest, they would aggressively have solicited accounts in a broader area and replace them in their association." Dr. Johnson also testified, "I would say that good management at this point for Richardson Savings and Loan dictates aggressive management in the market and aggressive location. On that score, I think the Belt Line and Coit location is imperative."

The record manifests a common conclusion, drawn from surveys and studies, that the intersection of Coit and Belt Line Roads affords a most favorable location for savings and loan facilities for the next five to ten years.

In his order denying a branch office to Guardian Savings, the Commissioner found:

(1) "that there is not sufficient public need for the proposed branch office and that the public convenience and advantage would not be served by the establishment of this office * * *."

(2) "the volume of business in the community in which the proposed branch office would conduct its business is not such as to indicate a profitable operation *in view of the Commissioner's action hereinafter referred to * * *."* (Emphasis added.)

(3) "and the proposed branch office would unduly harm" Richardson Savings "operating in the vicinity of the proposed location."

All other findings were favorable to Guardian Savings. The "Commissioner's action" referred to in the second finding stated above was his order approving earlier that day a branch office for Richardson Savings and Loan.

Immediately following his statement of the findings, the Commissioner continued:

"In this regard it was shown that the proposed branch [of Guardian Savings] is to be located at the intersection of Beltline and Coit Roads. * * * It was established at the hearing without any dispute, that the area to be served by the branch office at the location, is one of the fastest growing area of Dallas County and is projected to be one of the strongest growth areas in the future."

Advantages of this location were further stated by the Commissioner, in his order

denying Guardian Savings a branch office, in this language:

"The shopping centers already located at this intersection, together with those commercial developments proposed for the undeveloped corners of the intersection, will create a commercial center of a major regional type, to serve the fast growing population and development in this area of north Dallas County. The intersection has excellent major traffic access, both east and west, and north and south. To the immediate northwestern area adjacent to this intersection, there is proposed, and already under early stages of construction, a significant and substantial territory to be used primarily for residential development of above average cost residences."

The Commissioner's findings with regard to the past and future growth of the primary market area, and with respect to the advantages of the intersection of Coit and Belt Line Roads, are substantially supported by the evidence. It was the opinion of Dr. Johnson that this intersection "and the partly developed acreage constitutes the largest exposure potential in this northern territory other than the * * * property at Preston and Valley View," west of and outside the primary market. "To the north," Dr. Johnson stated, "until one reaches a northern most zoned area, quite a distance away, at least two miles away from [Coit and Belt Line Roads], one does not encounter shopping zones that can be developed with the major exposures that the [intersection] can provide."

"It is my judgment," Dr. Johnson testified, "and this is shared with many others who have analyzed the situation, that the [intersection] will eventually become a major shopping exposure for this general territory and that it will have department stores and major speciality stores in it. It is favored by excellent traffic routes east and west and north and south. At present, however, it is still a modest, essentially convenient shopping center."

"Another point to emphasize," Dr. Johnson testified, "is that there is a great territory for residential development to the northwest. It will develop rather rapidly, I think, and will provide an increasing market potential for operations located at the Dal-Rich Center [at Coit and Belt Line Roads], but it will happen at a good but nonetheless not fantastic rate, I suspect, conceivably seven, eight or nine hundred homes per annum on the average during the next seven to ten years, developing principally in this northwest area."

The Commissioner found, with respect to population and income of the market area, that:

"It was shown that the population in the 1960 census was approximately 13,872 for the area which would comprise the primary market for a facility located at this site. This population has increased to 36,000 by 1966 and is projected to exceed 48,000 persons by 1970. Likewise, the households in this same area were shown to be 3,676 in 1960 with an increase to 10,700 by 1966 and projected to exceed 14,750 by 1970. The average family income was shown to be over $11,500 with some estimates as high as $17,000 or $18,000. The majority of the residential housing in the area was shown to be less than five years old with values ranging from $20,000 on upward, with an average of at least $30,000."

In each of the two orders, one granting a branch office to Richardson Savings and the other denying a branch office to Guardian Savings, the Commissioner recited the identical facts related to public need and growth.

In the order denying a branch office to Guardian Savings, the Commissioner recited that:

"To serve the public need and growth indicated by the foregoing facts for the

area to be served by a savings and loan facility at this intersection * * * in *addition to the other savings and loan facilities already serving in this area,* the Commissioner has heretofore on this day made a decision and entered an order approving the application of Richardson Savings & Loan Association. From the applications, evidence and official records, the Commissioner does not find that there is a public need for *two additional* savings and loan facilities *at this location,* nor has there been shown a sufficient volume of business in the community in which the proposed branch office would conduct its business as to indicate a profitable operation for *two additional* savings and loan facilities." (Emphasis added.)

It is apparent that the Commissioner considered the two applications before him as requests for savings and loan facilities to serve a primary market already being served by the three offices located in downtown Richardson. While it was shown, as we have observed earlier, that there would be some overlap of the proposed primary market area and the market already being served, the evidence is clear that the three offices in downtown Richardson are two miles or more east of the proposed sites at Coit and Belt Line Roads and at the fringe only of the proposed market.

Dr. Johnson testified that the home office of Richardson Savings "* * * is on the very fringe of it [the proposed market], but not in the location to tap the market * * *." When asked about the overlap, Dr. Johnson testified: "There would be an overlap. I don't think substantial."

The three offices in downtown Richardson are concentrated in a small area, and facts relating to the location of the Richardson Savings home office, with relation to the proposed market to be served from Coit and Belt Line Roads, would be applicable to the two other downtown offices.

The proposed locations at the intersection of Coit and Belt Line Roads were found to be prime locations very largely because of the savings and loan opportunities afforded, and to be afforded in the future, by the territory west, south, and north of the intersection in which even a nominal overlap with another market does not exist. The testimony was undisputed that the area from which such a facility would attract sixty to ninety percent of its business extends about two miles in each direction. In most of the proposed market area no other facility, when this standard is applied, could be described as already serving the market, and competition from the downtown offices in Richardson therefore would appear to be negligible in all of the proposed market except in the insubstantial overlap.

Evidence was before the Commissioner that in 1966 there were 13,544 households in the proposed primary market area and a projection showing 21,896 in the area in 1970. If the proposed market should be served only by the three savings and loan offices in downtown Richardson, the number of households per office in 1966 in the primary market would be 4,515 and in 1970 would rise to 7,299. Dr. Johnson testified that by adding a branch office for Richardson Savings, the households in 1966 for each of four offices would be 3,386 and in 1970 there would be 5,474 households per office. Five offices, including the three downtown facilities, and two at Coit and Belt Line Roads would reduce the number of households per office serving the proposed market to 2,709 which number by 1970 would rise to 4,379. By 1968 a projection would show more households per office for five facilities than the number for four offices in 1966.

Guardian Savings proposed a primary market area and a secondary market in its application. As already indicated, the primary market area was bounded on the east by a fork of White Rock Creek. The area extended south to Johnson Freeway, west

to Dallas North Tollway, and north to the county line. Surrounding the primary market area, Guardian Savings indicated a secondary market area with its east boundary at Central Expressway. Its other boundaries, at least to the south and west, were about two miles outside the proposed primary market.

It was shown at the hearing that Guardian Savings had, within the primary and secondary market areas, a total of 304 savings accounts totalling $1,696,000 and 137 mortgage loans in the aggregate sum of $3,798,848. In the primary market, Guardian Savings had 79 savings accounts in the total amount of $337,500 and 59 mortgage loans totalling $1,698,000.

Guardian Savings, with its home office on Main Street in downtown Dallas, had two branch offices. The branch office on West Jefferson had total savings of $3,400,000 and the Lovers Lane branch office had $9,100,000 in savings accounts. The president of Guardian Savings, De-Witt Ray, Jr., testified that in his opinion the proposed branch at Coit and Belt Line Roads "will probably be the most profitable branch operation of any of our branches." Neither of the other branch offices is located so as to serve either the primary or secondary market area. The association, Ray testified, anticipated $2,000,000 in new savings for the proposed branch office and a profitable operation even in the first year. In 1965 the main office and the two branch offices grew approximately $3,700,-000 in savings. The association projected a gain in 1967 of $5,000,000 in savings and $4,650,000 in loans.

Guardian Savings argues that although handicapped by the absence of an office in the market area, the association has invested a much greater amount of savings in the area than has been received from it. "Institution and operation of the branch sought," Guardian Savings contends, "would afford Guardian the opportunity to render needed and beneficial savings and loan services to the public * * *."

■ We conclude that the Commissioner's findings of insufficient public need for the proposed branch office of Guardian Savings is not reasonably supported by substantial evidence.

The Commissioner's finding that the volume of business in the community was not such as to indicate a profitable operation for the Guardian Savings branch clearly was reached after first deciding to approve the Richardson Savings application. We do not find any direct testimony in the record to support this finding. Dr. Johnson testifying for Richardson Savings, expressed the opinion that if the Guardian Savings branch "could be staffed properly", it could be "operated at least at break even with two million dollars in accounts." Although Dr. Johnson considered the intersection of Belt Line and Coit Roads "better than good" as the location for a branch office, he was emphatic that "Richardson [Savings] needs that location without any other offices in that market."

Dr. Johnson testified, "I think that Guardian might have some difficulty generating business within a reasonable length of time to make their office a self-supporting office." This testimony clearly was based on the assumption that Dallas Federal would move its branch office from downtown Richardson to the site at Coit and Belt Line Roads, and that the Richardson Savings application for a branch office would be approved. "If Guardian were there," Dr. Johnson testified, "it would be engaged in a scramble with two associations, and the best part of the market and it might have some difficulty."

Testimony of Dr. Johnson, bearing on the matter of profitable operation for Guardian Savings and undue harm to Richardson Savings, is set out as follows:

"Q Now, you have already talked about the effect if Dallas Federal and Guardian both go in, and you are saying that if that situation results, in your opinion,

Guardian's office will not be self-supporting in a reasonable period of time? Is that correct?

A I think that it would have a hard competitive road. Richardson is already in the market serving it pretty effectively, and one doesn't switch those accounts over night. Notice Oakcliff's experience, according to our survey. It commanded a very modest percentage of the market, although it's been there since '65 and had a loan office before that in the same location, or approximately in the same location. I think it would be a slow business. Yes, sir.

Q A slow business?

A A slow matter of attracting accounts and developing a profit—in arising to a profitable level. Yes, sir.

Q At what point do you anticipate it would reach a profitable operation, Doctor?

A It depends on how they intend to serve it and what they intend to lend from it. If they concentrate on consumer lending, which is more productive in terms of interest income, earlier than otherwise.

Q Assume that they did not concentrate on consumer lending.

A If they staffed it as a good savings office and loan office—it's sparsely business—they are going to have to generate, in my judgment, certainly two million dollars, possibly more, before they can operate it effectively as a full purpose office.

Q All right, sir. Now, you are very familiar with that area out there, I take it. You live in North Dallas, as a matter of fact, don't you?

A Yes, sir.

Q I want to ask you, in your expert opinion, Doctor, how long assuming a

properly staffed and properly operated branch of Guardian, in your opinion, it would be before it would be a self-supporting office?

A I would have to know what they intended to do in the way of staffing and promotion before I could answer that.

Q Doctor, you just assume, if you will please for the record, proper staffing, however you defined it when you mentioned it a minute ago.

A I think that it could be staffed properly and operated at least at break even with two million dollars in accounts. Now, I don't think they are going to attract two million dollars in accounts in less than two years.

Q All right, sir. Thank you."

Testimony that Guardian Savings "might have some difficulty" because "engaged in a scramble with two associations", on an assumption Dallas Federal would move its branch office, and would have a "hard competitive road" is hardly the substantial evidence required to prove insufficient business to indicate a profitable operation for Guardian Savings.

We think there was lacking substantial evidence to support the finding of the Commissioner that the volume of business in the community in which the branch office would conduct its business was not such as to indicate a profitable operation for the Guardian Savings branch office.

We find in the record no factual evidence tending to support the Commissioner's finding that to grant the Guardian Savings application would result in undue harm to Richardson Savings and Loan.

It was Dr. Johnson's opinion that with Richardson Savings and Dallas Federal operating branch offices at Coit and Belt Line Roads, there would be "sufficient business to support both offices, provided an excessive number of office is not provided in the territory." If Guardian Sav-

ings should be located at Coit and Belt Line Roads, Dr. Johnson had no doubt "it would be a very critical impairment of Richardson Savings and Loan's growth potential and probably would result in a reduction, an attrition against its existing accounts."

We are unable to reconcile this testimony with that of Dr. Johnson, already set out above, that Guardian Savings would have a hard road competing with Dallas Federal and Richardson Savings because "Richardson is already in the market serving it pretty effectively, and one doesn't switch those accounts over night." Nor is it clear whether Guardian Savings or Richardson Savings' own proposed branch office would cause "attrition against its existing accounts", in view of Dr. Johnson's testimony earlier that fifty percent of the accounts presently in Richardson's main office from the region between Coit Road and Central Expressway would end up in the branch office.

We do not discover any testimony in the record that the Guardian Savings branch office would cause any attrition of the Richardson Savings loan business. Dr. Johnson testified only to "possible attrition" resulting to the savings accounts of Richardson Savings.

We are unable to find in this testimony the evidence of undue harm intended to be avoided under the statute. At the time of the hearing in September, 1966, Richardson Savings had approximately $14,500,000 in savings accounts and its loans amounted to $14,100,000. In connection with its application Richardson Savings was required to show a profitable operation for the three year period next preceding the filing. It was a stable, profitable association, operating in an area in which it was already well established. At the hearing the Commissioner asked Dr. Johnson whether he thought the Richardson Savings main office had a good location. Dr. Johnson's reply which bears upon the future of Richardson Savings is set out in full as follows:

"A They've got a pretty substantial investment of time in it, Mr. Commissioner, and also the prospective growth to the east of the Expressway would discourage me in suggesting that they retire from it. I think with the title Richardson Savings and Loan, their really great opportunity is identifying themselves with Richardson with great exposure so Richardson really feel they are available. I wouldn't want to relinquish the home office because of that; but at the same time I would be very fearful, if I were they, to be committed to it alone, in view of where the growth is. In short, I guess to abbreviate it, I think they really ought to have both."

The fact that Guardian Savings would furnish hard road competition in a scramble for business, resulting in some attrition to Richardson Savings, cannot be said to constitute substantial evidence to support a finding of undue injury to Richardson Savings. We find that the Commissioner's adverse finding is not reasonably supported by the substantial evidence.

Guardian Savings on appeal assigns a cross point of error under which it contends the trial court erred in holding the order of the Commissioner approving a branch office for Richardson Savings valid and binding and reasonably supported by substantial evidence. Appellants have filed a motion to strike the cross point presented by Guardian Savings.

The judgment of the trial court reflects that the Commissioner and Richardson Savings excepted to that portion of the judgment setting aside and holding for naught the order of the Commissioner denying the application of Guardian Savings for a branch office and gave notice of appeal to this Court. The judgment also shows that Guardian Savings excepted to and gave notice of appeal from that portion of the judgment holding valid, legal and binding the order of the Commissioner approving a branch office for Richardson Savings.

The Commissioner and Richardson Savings duly perfected their appeal. Guardian Savings did not file an appeal bond to perfect its appeal. Although the judgment was severable and the Commissioner and Richardson Savings gave notice of an appeal from only that part setting aside the order denying a branch office to Guardian Savings, the record does not disclose that appellants complied with paragraph (c) of Rule 353, Texas Rules of Civil Procedure. In order to limit the scope of an appeal, appellants under this Rule were required to serve separate written notice on Guardian Savings as an adverse party and file the notice with the Clerk within fifteen days after judgment or order overruling motion for new trial.

Paragraph (c) was added to Rule 353 in 1962 following the decision of the Supreme Court in Connell Construction Co. v. Phil Dor Plaza Corp., 158 Tex. 262, 310 S.W.2d 311 (1958). The Rule has been construed in Harms Marine Service, Inc. v. Swiere, 411 S.W.2d 602, Tex.Civ.App., Beaumont, writ ref., n. r. e., in which it was held that appellant there complied with the requirement of notice limiting an appeal.

The cross point presented by Guardian Savings is properly before this Court, and the motion to strike is overruled. We have carefully considered the cross point under the evidence disclosed by the record which we have already reviewed.

We conclude that there was substantial evidence before the Commissioner to support the findings upon which he approved a branch office for Richardson Savings. The trial court we think correctly found this order valid, legal and binding and reasonably supported by substantial evidence. The cross point is overruled.

The judgment of the trial court is in all things affirmed.

Affirmed.